Good morning, ladies and gentlemen. The first case in our docket today is the case of Bill Bailey, MD, and Cardiothoracic Surgery Associates versus Greensfelder, Hemker & Gale, SSM Healthcare, and Corp. and SSM Healthcare St. Louis. We have for the appellant Mr. Mike Keene, Caroline Farrellis for the appellee. We take that that's you. And Mr. Alpernides. And you are the three that are going to be arguing, correct? And Mr. Keene, you may proceed. Thank you, Your Honor. Good morning. Good morning. May it please the Court, Ms. Farrellis. I'm here this morning on behalf of Dr. Bill Bailey and his business, Cardiothoracic Surgery Associates, P.C. They're the plaintiffs in a breach of fiduciary duty case in St. Clair County brought against the defendants, Greensfelder, Hemker & Gale, Incorporated, and SSM Healthcare Corporation, SSM Healthcare St. Louis. We're here today because in July, I believe it was, we got a final ruling from Judge Lopino in the court below in which he compelled the disclosure of attorney-client privileged communications and attorney-client work product materials of a rather breathtaking scope. The plaintiffs have been ordered by Judge Lopino to disclose all of the documents and all of the communications occurring between themselves and their other attorneys in matters dealing with SSM since 2004 when Defendant Greensfelder jettisoned the plaintiffs as clients and offered to represent SSM exclusively in negotiations against them. So there are thousands of documents that are ordered to be disclosed at this point and we are here asking the court to reverse that motion to compel and to preserve the attorney-client privilege with regard to the plaintiffs. Let me speak to the attorney-client privilege for a second. We've all seen the ad campaign for Las Vegas. When I first saw it, I thought, I wonder if a former client of mine thought that ad campaign up, you know, what happens in Vegas stays in Vegas. Because when I have a client who I want to be completely candid and forthright with me in my office about a matter that I need to represent them on and that I need their candidness, I tell them what happens in this office stays in this office. What you say to me stays in this office. What I say to you and the advice I give stays in that office and the notes that I take are privileged as well. So you can feel like you're in a sanctuary and you can talk to me and you can help me represent you. The attorney-client privilege, Your Honors, is a bedrock tool in the process of advocating for people who are practicing law. And if the test for waiver, ad issue waiver of that privilege is to be the one developed by the State of Washington and not the one that tests ad issue waiver with whether or not privileged materials have been put at issue, the attorney-client privilege isn't as sank or sank as it should be. I submit to you, Your Honors, that with regard to Judge Locono's order, the attorney-client privilege should be made of sterner stuff. The standard of review in this case, as you know, is to note there's no deference to be given to Judge Locono's order. It's up to you. And I might state another thing that I think is unique to this case. All the cases you've heard, you do not have an Illinois case directly in point. I don't know whether there will ever be a case in the country that has this specific factual basis. But what you have is you've got circuit courts from the 3rd District. You've got federal district courts. You've got Washington, the State of Washington judges. We've cited cases from Florida, from Louisiana, and we've stated some cases from the 2nd District of the State of Illinois. The Lama case and any state of right are the 2 Illinois cases. But here's the thing. None of these cases are binding on this court. None of these cases do you need to look at as anything but illustrative of what you should do. You are not bound by any stare decisis of anything that anyone, not us, nor the defendants have cited to you. So the question is this. What are the three of you going to do? What are you going to decide with regard to that issue waiver of the privilege and how strong the privilege should be? And we have two competing interests in that regard in making this decision. On the one hand, you have the interest of the defendant attorneys who feel that they have the right because it's been pled that they have caused damage in regard to the settlement of this case, of the underlying case, that they have the right to explore successive attorneys' representation with regard to the issues that led to that, and even the right to explore matters that didn't have anything to do with that litigation, that occurred three years prior to that litigation between SSM and other lawyers. You have that competing interest that they have the right to discover and find potential relevant evidence to defend themselves on the issue of causation. And the competing interest is this, whether or not the bill daily in this industry and the plaintiffs in this case have the right, if they do not insert into this action, privileged materials to try to use it as a sword against the defendant, whether they have the right to keep it quiet, whether they have that right to have what happened in the offices and in the communications with their attorneys stay with their attorneys. Those are the competing interests in this case. I, for one, believe so strongly in the importance of the underlying policy of the attorney-client privilege field, that the right to go scouring through thousands of documents of privileged material between the attorneys and the clients in order to show somehow or find somehow how this settlement was unreasonable, to show that other attorneys caused an unreasonable settlement, when in fact there are plenty of ways to prove that without going through privileged materials. That's the easy way. That's the convenient way. But if you think about it, from the very get-go in this case, the defendant attorneys have the right to tell people, you signed this settlement document, you had your own attorneys consulting with you, they can call the dailies, they can call Bill Daley, they can ask him his communications as far as the settlement, why the institution entered into the settlement, and they can get experts to show that the settlement was valuable. I mean, look, we have a causation problem in the underlying case. Whether they get to scour through all the privileged materials or not, there's going to be a causation problem in the case, because they paid a million and a half dollars. One of the arguments that is made, and I again repeat to you, this is the thing, you are not bound by any case in society. This is a case of first impression. This could be an unremarkable case, because you could look at the facts and say it's never going to happen again. You could write a Rule 23 order and do it either way you wanted to. Or you could look at this and say, this is a seminal case. This is going to decide for the state of Illinois something that hasn't been decided. Are we going to allow the test for waiver, ad issue waiver in Illinois of the attorney-client privilege, to be based on relevancy? Or are we going to stick to the guns and say the attorney-client privilege is made of certain stuff? If it is not inserted into the case actively by the people with the privilege, you don't get to look at it. And sure, it's relevant. Attorney-client communications in these circumstances are always going to be relevant. You don't sit down in the attorney-client context and talk about a case, and poor wiring or bad wiring, and suing another wire, and then all of a sudden talk about why Donald Trump's hair is orange. So if relevancy is the test, it's a very dangerous slippery slope to no longer having that thing that is most important and bedrock to representing people, and that is confidentiality. The defendant says because of the pleading, the plaintiffs are using the attorney-client privilege as a sword. That's not the case. Nothing has been inserted into this case about privilege communications. They're not being used in any way. They're not being asserted in any way to have value to prove or disprove an issue in this case. They're not being used as a sword. All that Bill Daley wants, and his business wants, the plaintiffs want in this case, is for you to say, hey, you still have your shield. You're not using the information against the defendant. All you did was plead that the defendant did you wrong. You haven't conserved those privilege communications into the case. The plaintiffs are entitled to the shield. Now, you've seen in the briefs of the defendant, they say that this case is squarely in point with Pappas v. Hoffman. And I would take issue with that. I don't think that there's a single case that you have in front of you that is squarely in point with this one. But let's just look at the two cases. In Pappas, Pappas was terminated a month before a trial, and he had done the representation for a long period of time in that litigation. New lawyers came in and tried to think out a bad result. Then his client turned around and said, I'm going to sue you for not adequately, for poorly representing my interests. You didn't do a competent job in representing my interests. And Pappas sues for contribution against the lawyers saying, hey, it wasn't my fault. It was the lawyers that tried the case. And that's the circumstances in Pappas. Is that squarely in point with these guys, the facts that we have? I think it's a far cry and a tenable distinction to say that here we have, we are suing a former lawyer, not because the lawyer poorly represented our interests, but because that lawyer abandoned our interests, took up a position adverse to our interests with a party that was adverse to our interests, and promoted those adverse interests effectively for the other person, SSM. And did it in a cause of action that involved all things, the very work product that that attorney provided as protection against the kind of cause of action that was brought? Greensfelder drafted the non-competes and non-solicitations that were used, or wanted to be used, to shield the dismantling of the claims business. Is it a distinction without a difference? I don't know. I could be wrong. But I think the facts, the facts of this case, really, really depart from the facts presented in the Pappas case. Do they affect the decision making and the outcome? I would say this. In my opinion, yes. Because the attorneys here were not hired by the plaintiffs to take the place, necessarily, of Greensfelder. They were jettisoned by Greensfelder. These attorneys were hired because they had to be hired to defend against what Greensfelder and SSM were pursuing, which was to eliminate non-competes and non-solicitations that Greensfelder drafted. And then to turn around and say, but by the way, now we want to see everything that you and your attorneys talked about in having to defend against what we brought against you. You won't get the privacy of how you defended against us. We need to be able to see that because we need it. It's vital to us. It's vital for us to show. If we can see, and there's something in there that shows, that your subsequent lawyers sold you sharp for a million and a half dollars in the settlement. There is a Supreme Court case among the cases that you've been cited in the briefs that I should make a comment to, Fishel and Kahn. Because Pappas was cited in Fishel and Kahn. It's not authority that directs an outcome in this case. I go back. This is what the three of you want the law to be. You have no stare decisis pointing the way. But Fishel versus Kahn, the Supreme Court did have this to say. That the client's damages are subject to dispute by the parties does not mean that the client has waived its attorney-client privilege regarding communications between it and attorneys that might touch on that question. If raising the issue of damages in a legal malpractice action automatically resulted in the waiver of an attorney-client privilege with respect to subsequently retained counsel, then the privilege would be unjustifiably curtailed. That's not the opinion of the Supreme Court. It's just their comment on the situation. And it is instructive to the issue here and whether or not the attorney-client privilege and the work product should be unjustifiably curtailed in order for the defendant in this breach of fiduciary duty action to be able to scour through thousands of documents to see if they can blame the damages on somebody else. There are two cases that I think are important, at least from my perspective, of the way this should go between the two competing interests that the privilege should prevail over the ability to, based on pleadings of law, to invade that privilege. In reigning a state of right is the Second District case. And it had to deal with an earlier Second District case, Lama versus Skittle, I think, Skidkill. In any event, Lama. And it commented upon that, I believe. The Second District looked at its own work and it said, given the controversy surrounding the rule adopted at Lama, which was the Hearn-Pappas-type rule, we are unwilling to give it an expansive reading and to apply it beyond its stated facts. Such a broad exception would quickly swallow the attorney-client privilege and frustrate the important policy considerations it exists to protect. And its test that it applied in ad issue waiver situations was whether a litigant directly puts the attorney's advice at issue in the litigation and injects privileged material into the case. In other words, in order to open the privilege to invasion, the client has to assert a claim on defense and attempt to prove that claim of defense by disclosing or describing an attorney-client communication. Another case in our brief that gives instruction or guidance, and I believe is right on point to the way this case should be decided, is the Third Circuit case of Roan versus Poland. Poland. In that case, they talk about courts that apply the Pappas-Hearn test, and they say courts that apply that test dress up their analysis with a checklist of factors that appear to rest on a conclusion that the information sought is relevant and in fairness should be disclosed. Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged. And that remains the case even if one might conclude the facts to be disclosed are vital, highly probated, directly relevant, or even go to the very heart of the issue. The Third Circuit Court of Appeals, Federal Court of Appeals, is way over here. And the Washington courts, state courts, are way over here. And somewhere, somewhere there is a decision here that protects an interest, but it can't protect them. One has to prevail over the other. One has to be surrendered at the cost of the other. Unless there are any questions of the court, that's all I have to say. Thank you, Mr. Keene. You'll have the opportunity to go inside. Thank you.  Ms. Fairless. Ms. Fairless. Thank you. May it please the Court. The plaintiffs are trying to shield from discovery numerous documents and communications that the defendants of this case need in order to defend themselves against these claims. The question for this Court to decide is whether waiver applies under the circumstances of this case for three separate and independent reasons. And under any test, the answer is yes. First, the plaintiffs here are alleging that they entered into an allegedly deficient $1.5 million settlement solely due to the conduct of Greensfelder and SSL. By putting that settlement and the reasons for that settlement, proximate causation, that issue, they have waived the privilege. And every case that is considered an elegous pass has said so. Second, the plaintiffs also claim that they had no reason to know that they had a claim against Greensfelder or SSL more than two years before they filed this suit, even though they filed a motion to disqualify Greensfelder more than two years before they filed suit, and they settled more than two years before they filed suit. By injecting their knowledge into the case in the form of the discovery rule, they have waived privilege as well. And third, the plaintiffs have identified their own lawyers as having knowledge of Greensfelder's alleged breaches of fiduciary duty and as witnesses to testify in this case, the very lawyers whose files they refuse to divulge. Subject matter waiver applies there. And for that third separate reason, the privilege has been waived. Each of these reasons by itself would dictate that the files be produced. All three reasons taken together compel it. And for those reasons, this court should affirm the trial court. There is law from the Illinois Supreme Court that is on point, and that law regards the attorney-client privilege. In Illinois, there's a strong public policy promoting disclosure in order to affect the truth-seeking process. The Illinois Supreme Court discussed this in 1991 in the waste management case, and in that case, the court said the privilege is not the rule. It is the exception. It is the duty to disclose that is the rule. Therefore, the court said, the privilege ought to be confined to its narrowest possible limits. The waste management court also went on to explain that the at-issue exception wholly comports, those were the words it used, wholly comports with the truth-seeking function of the court and to the commitment of the Illinois public policy to full and fair disclosure. The Illinois Supreme Court reiterated those same tenets in 2012 in the Center Partners case and discussed the strong public policy again of Illinois in making sure that the truth comes out during the fact-finding process. And this court relied upon those same principles in reaching its decision earlier in this case when it held that the Common Interest Doctrine precluded SSM and Greensfelder from withholding documents that were produced after the time that Greensfelder stopped representing the plaintiffs in this case. There are three tests that other courts have used, and one of those tests is the court that the Illinois Supreme Court has used in deciding whether or not there is an at-issue waiver to the attorney-client privilege. The most lenient test is mere relevance. That is not the test that we are advocating. That is not the test that PAPA chooses. On the other end of the spectrum is the test that the plaintiffs are asking for, and actually they're even asking for a different test, but they rely on the Roan-Polank case, which says that the plaintiff has to actually rely on the attorney-client communications in order to prove up a claim or prove up a defense. Between those two approaches, which even one of the cases cited by the plaintiffs has characterized as extreme approaches, is what's been called the intermediate approach, which requires that the information not just be relevant, but that it be vital to a claim or defense to the opposing party. The intermediate test was the one that the Illinois Supreme Court, in fact, applied in the Fishel and Kahn case. As I mentioned, the plaintiffs aren't actually even asking this court to adopt the most restrictive test. They're asking this court to adopt the most restrictive test and then graft on an additional requirement, which is that there has to be some prima facie case, some prima facie showing of an entitlement to assert the privilege. In all of the cases cited by the parties dealing with that issue, privilege, that requirement appears nowhere. The extreme case, the most restrictive case that is advocated by the plaintiffs with additions, is inconsistent with Illinois public policy, which says that the privilege is the exception, not the rule. And as mentioned, it's also inconsistent with what the Illinois Supreme Court did in the Fishel and Kahn case. Now, in Fishel, the Illinois Supreme Court talked about the Pappas case. It did not do so in the context of criticizing Pappas. It certainly didn't disagree with the reasoning of Pappas. It distinguished Pappas on its facts for two reasons. First, it said that at the time of the alleged negligence of Fishel and Kahn, that negligence was in the rearview mirror long before the settlement, unlike Pappas. Let me explain that. In Fishel and Kahn, the lawyer at issue was a transactional lawyer who had advised the client regarding an Illinois consignment art act, and in particular had advised the client that they could limit their liability for lost artwork to the cost of the materials if they did certain things. The lawyer drafted contracts for its client to use in accepting consignment art, and later on there was a fire and all of the art was destroyed. Had the lawyer's advice been accurate, the client would not have been subject to any liability. But the lawyer gave negligent advice, and the client was sued as a result and had to pay a settlement as a result. The question there is simply the amount of damages is set. The question simply was the lawyer negligent. If the lawyer was negligent, the client had to pay. If the lawyer was not negligent, then there could be no liability in any event. That's very different than Pappas, where the lawyer was representing a client in a lawsuit over infected cattle. Shortly before trial, the lawyer withdrew. There was a bad result at trial and ultimately a settlement. And the Fishel and Kahn case distinguished Pappas because in Pappas, the lawyer's actions were intertwined with the litigation, intertwined with the settlement. So you couldn't just peel out the defendant lawyer and say that the defendant lawyer's actions caused the settlement without opening up all the communications between the client and the lawyer who represented the client in that lawsuit and in that settlement. In this case, you cannot peel apart Greensfelder and say that the plaintiffs settled an underlying lawsuit not because of the merits of that suit, not because of the risk of that suit, not because of advice they received from their lawyers, but because only because of Greensfelder's involvement. Without, in fairness, also allowing Greensfelder to look at all the other factors that any party would look at in settling a lawsuit. The second reason that the Fishel Court distinguished Pappas from the facts in the consignment art case in front of it was because in the consignment art case, the information from the lawyer's files was not vital, whereas in Pappas, it was. Again, if the lawyer was negligent, if the client was exposed to liability, the number was simply the number. Very different than where a client is saying, or a former client is saying, the lawyer approximately caused the client to enter into a settlement after the lawyer's representation had already concluded. Fishel and Kahn actually went through the analysis of, number one, was it relevant, and number two, was it vital. It used the intermediate test. Fishel and Kahn then went on and said, in order to apply that test, it's a very fact-specific inquiry, so we are going to look at cases from other jurisdictions that have similar facts to decide how we should decide the case under these circumstances. And so the court did that. In this case, every case with similar facts has come down on the side of waiver. To begin, causation of the settlement. The plaintiffs, even under the most stringent test, cannot explain why they entered into a settlement of litigation without necessarily implicating all of the attorney-client communications that they had with their lawyers at the time. And every case that has considered similar claims has said that's true. Pappas is one. Another case that said that there was a waiver was the Imperial Fire case. In Imperial Fire, there was a lawyer who had been retained by an insurance company to defend its insured in litigation. For whatever reason, the lawyer did not file an answer, and the default judgment was insured against the insured. The insured then sued the insurance company for a bad faith breach of insurance contract. And the insurance company settled that case for bad faith and then turned around and sued the lawyer that it had retained in the underlying lawsuit. That lawyer sought the files of the insurance company in the bad faith litigation, and the court said, yes, that's right. The insurance company has to turn them over because in order to prove why the insurance company entered into that settlement agreement, it's not fair to allow the insurance company to simply point at the lawyer and say, that's all we have to do. And what the court said there was that they had put at issue their actions of the insurance company, the actions of the lawyers in defense of the bad faith suit, the reasonableness of the decision to settle the bad faith suit, including the assessment of the risk of trial and the rationale for settling and the reasonableness of the settlement amount. Other cases that similarly have found waiver, where someone says a settlement approximately causes their damages, are the IMO industry case, which, again, looked at the specific facts and said, the facts of our case are more similar to POPIS than the artificial income. So we're going to go down the road of finding waiver. In FDIC v. R. W. Beck, the FDIC claimed that a defendant law firm's negligent advice precipitated an adverse ruling and caused the FDIC to have to settle. And again, the court found there was waiver. In the Rutberg v. Haynes case, a client was sued for malicious prosecution based upon conduct of its lawyers. And the defendant lawyer, who then was sued by the client, as a result, asked for the files of the lawyers who represented that client in the malicious prosecution case. And again, the court found there was waiver, because by putting into issue approximate causation, the client necessarily implicated the advice of lawyers in those cases. The Tuccio case is similar. There's another case from Illinois, which is the Fourth District, 2005 Western States v. O'Hara, which we led with in our brief. In their reply, the plaintiffs said, well, they should have spent more time talking about O'Hara. Actually, O'Hara is very much on point and supports waiver here as well. In that case, an insurance company that had a $500,000 limit had insured a driver in a horrible accident in which multiple people were seriously injured, including one who was paralyzed. The insurance company settled with the paralyzed person, paid policy limits, and then followed a declaratory judgment action seeking a declaration that it owed no more money under the policy. And the court found that in that case, the insurance company, too, had weighed the privilege because they could not assert that they had exhausted policy limits in bad faith while at the same time guarding and protecting the communications that it had with its lawyer about that same settlement. The only cases involving settlement that have not been waivered are very different circumstances where approximate causation is not the issue. Plaintiffs also have waived the privilege under the at-issue waiver because they have put at issue their knowledge of when they had a claim against Rietvelder and SSL. In their reply brief, the plaintiffs say that we have slipped this in by putting it in front of the court a fourth amended complaint. But in fact, this has been in the case for years. And the plaintiffs in their briefing talk about the fact that they did not know of the extent of the breaches. And so they can see that this is an issue in this case. Lama addressed this exact same issue. Now, Lama has been criticized on its breath, meaning it has been limited to its facts. In re's state of right did that. But importantly, even if Lama has been limited to its facts, the facts here exactly track the facts of Lama. And in In re's right, the court, after limiting Lama to its facts, actually cited Pappas with approval as one of the cases that it thought was pertinent. The facts of Lama, as I mentioned, are directly on point here because in that case, which was a medical malpractice case, the plaintiff argued that its claims, which facially seemed to be time-barred, were not because of the discovery rule, because the plaintiff did not know of the doctor's alleged negligence. And the court held that by raising the issue of whether she knew or should have known of her injury prior to the end of the limitations period, the plaintiff voluntarily injected into the case the factual and legal issues of when she learned of her issue and thus waived any attorney-client privilege and also held the defendant needed that information. The same result applies here. There's no way for the defendants in this case to be able to prove up what the plaintiffs knew at the time that they settled the case, what they knew at the time they moved to disqualify Greensfelder, but for discovery of these privileged documents. Other cases cited by the plaintiffs stand for the same result. Byers v. Burleson and Connell both appear in the block quote in Plaintiff's Brief. And both of those cases held that the privilege had been waived because the plaintiff in that case had injected into the case the discovery rule and when they had knowledge sufficient to run the statute of limitations, or they injected into the case equitable estoppel, which also implicated their knowledge. Cuckoo v. City of Morris, which was cited by the plaintiffs, stands for a similar result where the plaintiffs waived the privilege as a result of asserting, as a basis for avoiding the statute of limitations, knowledge that put the lawyers' communications with them at issue. There's another Illinois Court of Appeals case that also holds the same, stands for the same result, which is the Stewart Title Guarantee case. In that case, which was a case over insurance coverage, the title insurance company sought to withhold documents because even though it had claimed that it had waived rights based upon a fraud, essentially, a misunderstanding that had been given to it by another party. And the court in that case said that by alleging in its complaint for declaratory judgment that another party had concealed material facts resulting in the title company's waiver of its reservation of rights, it had put its attorney-client privilege at issue, and therefore, the privilege was waived. So all of the cases that are factually analogous, that deal with waiver of the statute of limitations, including two Illinois Court of Appeals cases, have all come down on this side of waiver. The third reason that plaintiffs have waived the privilege is subject matter waiver. By identifying their counsel as witnesses and by injecting their knowledge into the case, they have waived the privilege as well. The Rutgerd v. Haynes case stands for this proposition as well. Interesting, Rutgerd v. Haynes was a situation where we had two of the three factors that we have here. In Rutgerd v. Haynes, the plaintiff alleged that the defendant's conduct possibly caused a settlement, and the plaintiff had identified their attorneys as witnesses. In the Rutgerd case set, for each of those reasons, there was a waiver. The vast majority of the waiver cases deal with only one of those situations. Here we have all three. It's also worth bearing in mind that even if there was no waiver, which under the facts of this case there is for multiple reasons, the plaintiffs cannot assert a blanket privilege. The cases that they have cited, the Roan case, for example, have held just that. In Roan, the court said there has to be a determination on a case-by-case, document-by-document basis of what's privileged or not. You can't just say all of the lawyer's files are privileged because facts are not privileged. Facts even conveyed by the lawyer to the client are not privileged. Advice may be, but you can't simply withhold all of the files. In that case, the court said there had to be a document-by-document review with redactions of any actually privileged information. The plaintiffs in this case, their position essentially boils down to two words. Trust us. The plaintiffs say trust us when we tell you that we have done these for these reasons. You don't need the documents to peel back our assertions. You don't need to be able to cross-examine us or our lawyers. This is not consistent with Illinois law or public policy, and this court cannot comment. Thank you. Thank you, Ms. Farrell. Let me, because I didn't address the subject matter jurisdiction issue at all, and by the way, Judge Lopono's order doesn't say it doesn't have any reasoning. He just entailed thousands of documents to be disclosed that are privileged documents, but subject matter waiver was argued. We answered an interrogatory that asked for people with knowledge about the breach of fiduciary duty, and it would have been dishonest to say that it wasn't people who were attorneys. Does it make any difference whether or not you intend to call cases witnesses? We didn't nominate them as witnesses. I think it's very important to note that subject matter jurisdiction occurs where you try to selectively put privileged material into issue on a case, and then you open the door to, in terms of that attorney's conversation, whatever it was, it all comes, or at least it's all disclosed. I just don't think subject matter jurisdiction would have been what Judge Lopono would have been if he didn't call. With regard to the at-issue waiver issue, you know, it's up for grabs. I do want to take issue with counsel suggesting that in all attorney cases, attorney misconduct cases, that all of them adopt the POPIS rule in terms of the test. We've cited two cases in our reply brief. They're all over the board. I think the better way to treat it is, hey, what happens in Vegas stays in Vegas, that if you don't try to use it and inject it into the case, you shouldn't have to disclose all of it. It's your privileged material. And the other point that I think needs to be made is in none of the cases that have been cited by the defendant in this case to justify this broad, breathtaking disclosure, compulsion to disclose privileged material, not one of them involved attorneys switching sides. We've cited one case that involved it, not in terms of a waiver, but in terms of switching sides, and that was the Milbank case that's in our reply brief. In that case, the attorney that switched sides wanted to blame his client for the losses. And there that court looked at that issue and said, holding that in cases where an attorney switches sides on a client, there is a compelling reason to apply a prophylactic rule on causation to remove the incentive to breach because the attorney's unique position of trust and confidence. Now, how does that factor in here? This is the only case, there's no cases they've cited that involve switching sides. Should this court allow them to go into causation? That's why they think they're entitled to it. They didn't, the court in Milbank looked at it and said, hey, wait a minute. You're not going to breach fiduciary duties and breach your confidence and be disloyal to the client. By the way, this court, the law of this case, your earlier opinion hasn't been discussed here, but in that opinion, you said at the very time that this settlement was going down, at the very moment that the plaintiffs had to decide whether to take it or not, there was a continuing duty of loyalty on the part of Greenspelt to the plaintiffs. How does that square with them asking for thousands of documents that were privileged material on causation? I want to talk about Obama for a minute. Now, we have filed leave to file a Fourth Amendment complaint because of all things, six years into this litigation, Greenspelter decided, hey, you know what we're going to do? We're going to dismiss it because the statute is broken. And there has been a complaint drafted. You have it attached in an appendix, but it's not part of the record. And it shouldn't be argued to you at this point. It's premature to even factor that in to what this case is about because it wasn't in front of the trial court. He hasn't decided whether it's going to be allowed to be filed. But yet they're arguing it here to you as reason why there is waiver of the privilege. And as I said before, the State of Right, the Second District, after deciding long on an issue of, well, when. You can finish your. I've said enough. There's your call.